NORTHRUP v. PHILADELPHIA & R. RY. CO. et al.

(Circuit Court of Appeals, Second Circuit. April 25, 1916.)

No. 241.

COLLISION ☞71(2)—TOW AND STATIONARY DREDGE—FAULT OF TOWING TUG.

A collision in Kill von Kull at night between a canal boat, forming part of a tow of 15 boats in tiers of 3, and a scow alongside a dredge engaged in deepening the channel, *held* due to the fault of one of the towing tugs in directing the casting off of the lines between the rear starboard boat, which was to be taken out of the tow, and the boat ahead of them continuing to push at the stern of the tow, which forced the latter boat out of the course of the tow and into collision with the scow. The dredge *held* not in fault as obstructing the channel; it appearing that there was a clear channel of over 400 feet on the side of the tow.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. ☞71(2).]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by George Northrup, owner of the canal boat Senator Rice, against the steam tug Bern, the Philadelphia & Reading Railway Company, claimant, and the Morris & Cummings Dredging Company, impleaded. Decree against the Bern, and claimant appeals. Affirmed.

Armstrong, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for claimant-appellant.

Park & Mattison, of New York City (Henry E. Mattison, of New York City, of counsel), for libelant-appellee.

Everett, Clarke & Benedict, of New York City (A. Leo Everett, of New York City, of counsel), for respondent-appellee.

Before COXE and ROGERS, Circuit Judges, and HOUGH, District Judge.

ROGERS, Circuit Judge. This suit arises out of a collision, and the libelant sues as the owner of the canal boat Senator Rice. The libelant brings the suit on his own behalf as owner, and on the behalf of the underwriters on the boat, against the steam tug Bern, owned by the Philadelphia & Reading Railway Company. The injury to the Senator Rice occurred while that boat was in tow of the steam tugs Bern and Wyomissing, and resulted in the beaching of the boat. The injury resulted from a collision with a scow alongside of a dredge in the channel of the Kill von Kull. The owner of the Bern filed a petition, under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi), against the Morris & Cummings Dredging Company, alleging that that company was responsible for the injury to the Senator Rice.

On the night of January 7, 1914, the Senator Rice, loaded with 315 tons of coal, left Port Reading in tow, with other boats, of the steam tugs Bern and Wyomissing, bound for Thirty-Seventh street, East River, New York. The tow consisted of 15 boats, made up of 5 tiers of 3 each. The Senator Rice was in the fourth tier on the starboard

side. The Wyomissing was in charge of the tow, which it had on a hawser, and the tug Bern was assisting at the stern of the tow. The tow left on flood tide. The pilot knew that the dredge was there, and that the scow was next to the dredge. He had been past the dredge in the afternoon, and knew all about the situation. Moreover, he admitted that the dredge was lighted up at the time of the accident, and that he saw her and the scow. The tugs and tow proceeded on their way until in the vicinity of Elizabethport, about 2:15 a. m., when the steam tug Bern dropped back to take out of the tow the boat which was directly astern of the Senator Rice. The Bern made fast on her port side to the starboard side of the coal boat and started to back away before all the lines were cast off between the boats she had in tow and the one next to her. When the tug started to back, the last tier of the tow was thrown out of position, and the Senator Rice was shoved into a dredge which was lying about in the middle of the stream, breaking the stem and three timbers of the Senator Rice.

The libel charges that the collision was caused through the fault and negligence of the Bern and those in charge of that tug, in the following particulars: (1) In attempting to remove the boat from the tow before all the lines from said boat to the tow had been cast off. (2) In causing the Senator Rice to come in contact with a dredge which was at anchor. (3) In failing to give signals to the Wyomissing to stop. (4) In not preventing the Senator Rice from coming in contact with the dredge. The libel denies that the collision was caused by the Senator Rice, or those in charge of that boat.

The answer states that the tow was handled with the utmost care and with adequate help; that it was not caused or contributed to by any negligence on the part of the claimant, but was caused or contributed to by the negligence of said dredge or owners in unlawfully obstructing the channel. The answer of the Dredging Company states that it was engaged in the work of widening and deepening the channel of Staten Island Sound, between Elizabethport and the Baltimore & Ohio bridge, under a contract with the United States government, and it was duly permitted under its contract, and by authorization of the proper government engineer, to work by night as well as by day; that in doing such work it necessarily placed its dredge in the channel of the stream and worked with scows to receive the dredged material, and that it did so with as little interference with navigation as possible; that on the night of January 7, 1914, its dredge was brilliantly illuminated and had in position so-called passing lights, indicating on which side of the dredge a moving vessel should pass; that its dredge was not working in the middle of the channel, and there was always abundant room for a properly made-up tow to pass in safety between the dredge and the shore; that if a collision resulted, as alleged in the petition, it was solely due to fault and negligence on the part of the Philadelphia & Reading Railway Company, its agents and servants, and was in no way due to fault on the part of the respondent.

The dredge was engaged under the supervision of the government in dredging the waters of the Kill von Kull at a point where a channel 400 feet wide had to be deepened. The channel between the dredge

and the New Jersey shore was 450 feet; and between the side of the scow next to the dredge and receiving the dredged material and the shore it was 415 feet. The contract between the Dredging Company and the government expressly requires the contractor to conduct the work in such a manner as to obstruct navigation as little as possible, and in case the contractor's plant so obstructs the channel as to impede the passage of vessels, it must promptly be so moved as to afford a practicable passage on the approach of any vessel.

It is impossible to have a dredge in the Arthur Kill without to a certain extent obstructing the channel. We cannot, however, hold that the channel was so obstructed in this instance as to impede the passage of this tow. All that the contract and the law requires is that there should be afforded a practicable passage for the tow. A 400-foot channel for a 75-foot tow is certainly no such obstruction as would render the dredge liable on the ground that it obstructed navigation within the meaning of the law. The injury which occurred could not have happened if those in charge of the tow had not approached so near the dredge. But, even as it was, the accident would not have happened if it had not been for an order that was given to which reference is hereinafter made. It is perfectly evident to us that those in charge of the tow, not only had the necessary channel, but that they were well aware that there was no necessity for withdrawing the dredge, and that they did not ask to have it withdrawn.

The government inspector was on the upper deck of the dredge when the accident occurred and saw the collision. He testified that all the lights were showing on the dredge and that on the approach of the tow he heard no danger blasts. This was confirmatory of the master of the dredge who heard no alarm from the tug.

The reason for this collision is not involved in the slightest uncertainty. That reason was the premature throwing off of the lines between the Wayne and the Senator Rice while the flotilla was passing the dredge. The Senator Rice was the starboard boat in the fourth tier, and the Wayne was directly behind her in the fifth tier. It appears that it had been planned to take the Wayne out of the tow at a point somewhat further up the Kills. The master of the Senator Rice testified that he had been informed of this plan when starting from Port Reading. Some time before reaching the dredge he received whistles either from his tug, the Wyomissing, or the helper, the Bern, which he construed as a signal to throw off the lines between the two barges. The result of the throwing off of the lines was that the Senator Rice did not keep its alignment in the tow. In no other way is it to be accounted for that the starboard boats in the first three tiers cleared the scow.

The testimony of the master of the Senator Rice is as follows:

"Q. Where were you on your boat at the time of this collision? A. I was walking to the bow about half way through her. Q. Just go on and tell us what you saw. A. What I saw, I was walking to the stern letting go of the lines on the other boat. Q. Why were you doing that? A. That was just before she struck I was letting the spring lines off the boat behind. Q. Why were you doing that? A. We were going to take the boat off. Q. What happened when you started to take these lines off? A. The boats were swinging

towards the tow, and all I know she struck the dredge. Q. Are you able to say whether all the lines on this particular boat had been taken off? A. Yes, sir. Q. What about the lines from that boat to the boat on the port side? A. I don' know; I didn't see them. Q. You say you got the lines from the stern of your boat to the bow of the boat astern of you free, did you? A. Yes, sir. Q. How many lines did you throw off? A. Two spring lines. Q. Was that all you did? A. That was all. Q. Was it then the collision happened? A. Just a little while after."

The testimony of the captain of the Bern is as follows:

"Q. Had you given any signal to this man on the Senator Rice or the Wayne No. 4 to cast off their lines before you got by that dredge? A. Yes, sir; one line the inside tow line. Q. How did you do that? A. Well, I was laying just like that ready to shove. I said, 'Let go your inside tow line, so you will be handy to get off.' Q. Who did you say that to? A. I guess it was the captain of the Wayne 4. Q. Did he do it? A. Yes sir. Q. Was that the only line? A. Yes; and he had breast lines out besides. Q. Did they in any way interfere with the position of the boats in the tow from what they were before the casting off of the line? A. No. Q. That was before you came to the digger? A. Yes, sir. Q. How long before? A. A couple of minutes; I was just going by the digger. I thought everything would be all right. Q. You got three tiers through all right, didn't you, past the scow? A. Yes. Q. The Senator Rice hit the scow alongside of the mud digger? A. Yes, sir. Q. Do you know how she hit? A. Well, the only thing I know was on the corner of the scow. Q. The Jersey corner? A. The Jersey corner, on the mud scow. Q. Were you pushing then with your tug? A. Yes, sir. Q. How did you keep away, to keep yourself from getting in? A. I kept pushing all the time. Q. Did you succeed then in getting the Wayne No. 4 clear? A. Yes, sir. Q. And yourself, too? A. Yes, sir. Q. You didn't let go in order to back out and get away? A. Yes, sir. Q. Did the Senator Rice break out of the tow? A. She hit. I don't know whether she parted the tow line, or not, to the boat ahead. Q. He said he cast them off long before. A. Cast his own tow lines off.

"Mr. Mattison: No; cast the lines astern of him.

"Q. Do you know what condition the lines were in between the stern of the Rice and the Wayne No. 4? A. No. Q. You don't know whether they were on or off? A. Well, they must be on, because she hung on—hung on to the tow. Q. They were all moving right along? A. Yes, sir. Q. If his lines had been off her— A. He would drift away from the tow."

When the lines of the Wayne were cast off pursuant to orders, the strain on the lines not cast off, caused by the pushing of the tug Bern, resulted in throwing the bow of the Senator Rice so far out to starboard that it hit the scow. The collision was due solely to the negligence and lack of skill on the part of the captain of the Bern in ordering the lines cast off at the time he did and in so navigating the Bern as to force the Senator Rice out so far to the starboard. We think the court reached the right conclusion in this matter, and we agree in holding that the dredge was not at fault.

Decree affirmed.